865 P.2d 779

STATE of Arizona, Appellee/Cross–Appellant,

v.

Debra Jean MILKE, Appellant/Cross–Appellee.

No. CR–91–0048–AP.

Supreme Court of Arizona, En Banc.

Dec. 21, 1993.

**120**

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section and Randall Howe, Asst. Atty. Gen., and Richard M. Romley, Maricopa County Atty. by Noel Levy, Deputy County Atty., Phoenix, for appellee/cross-appellant.

Dean Trebesch, Maricopa County Public Defender by James H. Kemper, Deputy County Public Defender, Phoenix, for appellant/cross-appellee.

## OPINION

MOELLER, Vice Chief Justice.

### STATEMENT OF THE CASE

Defendant, Debra Jean Milke, was convicted by a jury of first degree murder, conspiracy to commit first degree murder, kidnapping, and child abuse. The victim of each of these crimes was her four-year-old son, Christopher. Defendant was sentenced to death for the murder of her son and to terms of imprisonment on the other counts. Appeal to this court is automatic on the death sentence, see Ariz.R.Crim.P. 31.2(b), and defendant timely appealed the other convictions and sentences. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, 13–4033, 13–4035. The state has filed a cross-appeal. We have jurisdiction of the cross-appeal pursuant to A.R.S. § 13–4032(5).

Milke's co-defendants, James Styers and Roger Scott, were convicted in separate trials and have also appealed. Although the three cases were consolidated for oral argument, we resolve each by separate opinion.

### FACTS

Debra Milke and her four-year-old son, Christopher, shared an apartment with co-defendant James Styers and his two-year-old daughter. While Milke worked at an insurance agency, Styers, an unemployed and disabled veteran, watched Christopher. Milke and Christopher's father were divorced, and Milke had legal custody of Christopher. Christopher's father often visited with his son and sometimes took him overnight.

In September, 1989, shortly after beginning a new job, Milke took out a $5000 life insurance policy on Christopher as part of her employee benefit plan. The policy named Milke as the beneficiary. Sometime between the time she bought the policy and the time of Christopher's death, Milke and Styers discussed the policy and the benefits.

At about 11:00 a.m. on Saturday, December 2, 1989, Styers, with Milke's permission and in her car, took Christopher from the apartment. Styers told Christopher they were going to Metrocenter so Christopher could see Santa Claus. Styers then picked up co-defendant Roger Scott, and the two men and Christopher had lunch and ran some errands. Later, Styers told the police that he first dropped Scott off and then took Christopher to Metrocenter to see Santa Claus. Styers told the police he had to use the restroom, so he took Christopher into the men's room at Sears and had him wait outside the stall but inside the restroom. When he came out, Christopher was allegedly gone. Styers reported this scenario to Metrocenter security; eventually the police were called. In this initial story, Styers claimed that he met Scott outside of Sears while looking for Christopher, that Scott told him that he had come to Metrocenter with a friend named Phil, that Styers and Scott looked for Christopher for a while, and that Styers eventually walked Scott to the bus stop and Scott went home.

Styers called Milke around 2:45 p.m. and told her that Christopher was missing from Metrocenter. Milke called her father in Florence, Arizona, and told him Christopher was missing. Milke's stepmother, stepsister, and stepsister's boyfriend drove to Phoenix Saturday evening to be with her. Milke was

interviewed several times throughout the night by police officers. She went back to Florence with her relatives on Sunday afternoon, December 3.

In the meantime, the Phoenix police interviewed Scott. Scott's first story coincided with Styers' first story, but ultimately Scott led police to Christopher's body. After that, a Phoenix police detective flew to Florence to interview Milke. She was told that her son had been found shot to death in the desert and that she was under arrest. The detective read her her *Miranda* rights, which she stated she understood.

Milke told the detective that she was upset with her son because he was going to turn out like his father—in jail, an alcoholic, and a drug user. Milke said that she verbalized these fears to Styers but did not think that he would ever hurt the child. She stated that she was not crazy, she just did not want Christopher to grow up like his father. She told the detective that she wanted God to take care of Christopher. She said she thought about suicide but decided against it because Christopher would then be in his father's custody. She decided it would be best for Christopher to die. She stated that she had a hard time telling Styers what she wanted, but she finally told him, and he agreed to help. Milke and Styers discussed the plan several times and included Scott on at least one occasion. Ultimately, they decided that Styers and Scott would take Christopher, kill him, and then report him missing at Metrocenter, but Milke was not to know how Christopher was killed.

On Saturday morning, December 2, 1989, Styers told Milke that they were going to murder Christopher that day. They told Christopher that he was going to see Santa Claus at Metrocenter. Milke told police that she did not have a $5000 life insurance policy on Christopher, but her father did. She denied that insurance money was her motivation, but admitted that it may have been Styers' and Scott's because Styers knew of the policy. Milke was arrested and taken back to Phoenix.

At trial, the state withdrew the felony murder allegation. The jury found Milke guilty of premeditated murder, conspiracy to commit first degree murder, kidnapping, and child abuse. The state alleged and the jury found the crimes of conspiracy, kidnapping, and child abuse to be of a dangerous nature. A.R.S. § 13-604. Milke was sentenced to death for the murder, a concurrent life sentence without possibility of parole for 25 years for conspiracy, a concurrent 20 years for child abuse, and a consecutive sentence of 20 years for kidnapping.

## ISSUES PRESENTED ON APPEAL

1. Whether it was error to strike one of the veniremen for cause.

2. Whether the jury instruction on motive constituted fundamental error.

3. Whether the child abuse conviction is based upon sufficient evidence.

4. Whether Arizona's death penalty statute is unconstitutional because:

 a. the jury does not determine whether aggravating factors exist in capital cases, and

 b. the sentencing court's discretion is not adequately channeled.

5. Whether the death penalty was properly imposed in this case.

## ISSUES PRESENTED ON CROSS–APPEAL

6. Whether the trial court erred by refusing to admit co-defendant Scott's confession at Milke's sentencing hearing.

7. Whether the trial court imposed an illegal sentence when it sentenced Milke to a concurrent rather than a consecutive sentence for child abuse.

8. Whether the trial court imposed an illegal sentence for conspiracy to commit first degree murder when it sentenced Milke pursuant to § 13-1003 rather than pursuant to § 13-703(A).

## DISCUSSION

### 1. Excusal of Venireman for Cause

Defendant argues that the trial court erroneously struck a venireman for cause based on his opposition to the death penalty. The

trial judge asked the panel the following question:

THE COURT: Is there anyone here who ... would rather not sit as a juror on this case because of the charge of first degree murder and because there is a possibility that the death penalty could be imposed?

Mr. M.?

P.M.: Yes.

THE COURT: Would it make a difference if I told you that the jurors did not determine punishment; even in a capital case that decision is left to the Judge?

P.M.: I don't think I'd want to have anything to do with it. I don't believe in capital punishment.

THE COURT: All right. Thank you, sir. Anyone else?

The prosecutor later asked the court to strike P.M. for cause, which it did. Defense counsel did not object to this excusal, and both the prosecutor and defense counsel passed the panel for cause.

■ Defendant waived any objection to the excusal "both by failing to object at the time of the excusal ... and by expressly approving the panel at the conclusion of voir dire." *State v. Arnett*, 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978) (citations omitted); *see also State v. Walton*, 159 Ariz. 571, 580–81, 769 P.2d 1017, 1026–27 (1989), *aff'd on other grounds, Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

■ Even if defendant had not waived this issue, the excusal was proper. The matter of excusing jurors is committed to the sound discretion of the trial court and, absent clear and prejudicial abuse of that discretion, its determination will not be disturbed on appeal. *Arnett*, 119 Ariz. at 50, 579 P.2d at 554. It is not improper to excuse a juror whose views about the death penalty " 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *State v. Martinez–Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678, *cert. denied*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)); *see also*

*State v. Sparks*, 147 Ariz. 51, 55, 708 P.2d 732, 736 (1985).

## 2. Motive Instruction

The trial court instructed the jury that "[i]t is not necessary for the State to establish a motive for the Defendant to commit the crime." Although defense counsel objected generally to the instruction on the ground that the negative language detracted from the state's positive burden of proving guilt beyond a reasonable doubt, he agreed that it was a correct statement of the law. On appeal, defendant raises a new objection: that the instruction was an incomplete statement of the law.

■ "Absent a finding of fundamental error, failure to raise an issue at trial ... waives the right to raise the issue on appeal." *State v. Gendron*, 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991); *see also* Ariz.R.Crim.P. 21.-3(c). Therefore, defendant must establish that the motive instruction constituted fundamental error.

Error is fundamental when it reaches " 'the foundation of the case or takes from the defendant a right essential to his defense,' " or is an " 'error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial.' " *State v. King*, 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988) (citations omitted); *see also State v. White*, 160 Ariz. 24, 31, 770 P.2d 328, 335 (1989).

■ In *State v. Hunter*, 136 Ariz. 45, 49–50, 664 P.2d 195, 199–200 (1983), this court held that the same motive instruction now under consideration, although a correct statement of the law, was an *incomplete* statement of the law. In *Hunter* and in this case, the jury was not told that a *lack of motive* is as relevant to a defendant's innocence as the presence of a motive is to guilt. When a motive instruction is requested, the court should instruct that "the state need not prove motive but motive or lack of motive is a circumstance that may be considered in determining guilt or innocence." *Hunter*, 136 Ariz. at 50, 664 P.2d at 200. In *Hunter*, the defendant had made a proper objection in the trial court. The incomplete instruction, cou-

pled with an improper refusal of a *Willits* instruction,[1] led this court to reverse the conviction in *Hunter* because we could not say beyond a reasonable doubt that the errors were harmless.

■ In determining whether the incomplete instruction rises to the level of fundamental error in this case, the "omission must be evaluated in light of the totality of the circumstances." *Gendron*, 168 Ariz. at 155, 812 P.2d at 628. Defendant argues that the incomplete instruction deprived her of her essential right to rely on lack of motive as a circumstance tending to show innocence. The state contends there was no fundamental error because any prejudice defendant suffered by the incomplete instruction was cured by the closing arguments of defense counsel. *See State v. Bruggeman*, 161 Ariz. 508, 510, 779 P.2d 823, 825 (App.1989) ("Appellate courts do not evaluate jury instructions out of context.... Closing arguments of counsel may be taken into account when assessing the adequacy of jury instructions." (citations omitted)). Under the facts of this case, we agree with the state.

■ Defendant was not deprived of any right to rely on lack of motive as a circumstance tending to show innocence. In closing arguments of counsel, motive and lack of motive were discussed several times by each side. Indeed, defense counsel's closing argument focused on refuting every motive offered by the state and attempting to show they were illogical. The arguments eliminated the possibility recognized in *Hunter*: that the jury might be misled into thinking that motive or lack of motive is insignificant. The jury was not misled as to the significance of motive or lack of motive, nor was the defendant prevented from arguing lack of motive at closing. *Cf. State v. Tucker*, 157 Ariz. 433, 447, 759 P.2d 579, 593 (1988) (holding that trial court's refusal to give any motive instruction was not fundamental error in part because the defense theory was adequately covered in closing arguments); *State v. Ferguson*, 149 Ariz. 200, 212, 717 P.2d 879, 891 (1986) (same). Certainly, we cannot say that the instruction here made it impossible for

defendant to receive a fair trial; thus there was no fundamental error. *Gendron, supra.*

### 3. Child Abuse Conviction

■ In the companion case involving co-defendant Styers, we have today held that, under the facts of this case, a separate child abuse offense under A.R.S. § 13–3623(B)(1) did not occur when Christopher was murdered *with premeditation.* For the detailed reasons for this ruling, see the analysis in the companion case, *State v. Styers*, 177 Ariz. 104, 108, 865 P.2d 765, 769 (1993). Although not specifically challenged in this case, we necessarily set aside this defendant's conviction for child abuse pursuant to our statutory obligation to review for fundamental error. A.R.S. § 13–4035. We emphasize, as we did in *Styers*, that our holding has no effect on the use of child abuse as a predicate offense for felony murder.

### SENTENCING ISSUES

### 4. Death Sentence

#### A. Constitutionality

■ Defendant contends the Arizona death penalty procedure is unconstitutional because the jury does not determine the existence of aggravating factors and because the judge's sentencing discretion is not adequately channeled.

The same Fourteenth Amendment challenge to the fact that the judge determines the existence of aggravating factors was rejected in *Clark v. Ricketts*, 958 F.2d 851, 859 (9th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 117, 121 L.Ed.2d 73 (1992). *Clark* reasoned:

> The Supreme Court has forcefully rejected a similar challenge in the context of the sixth amendment: "'Any argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court.'" *Walton v. Arizona*, 497 U.S. 639, [647] 110 S.Ct. 3047, 3054, 111 L.Ed.2d 511 (1990) (quoting *Clemons v. Mississippi*, 494 U.S. 738, [745]

---

1. Based on the case of *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964).

110 S.Ct. 1441, 1446, 108 L.Ed.2d 725 (1990)).... Clark's invocation of the equal protection clause does not change this result. The Constitution does not require that a jury find the aggravating circumstances supporting a death sentence.

*Id.* *Clark*'s reasoning is persuasive; therefore, we reject defendant's claim. *See State v. Landrigan*, 176 Ariz. 1, 6, 859 P.2d 111, 116 (1993).

In *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988) (citing cases), *cert. denied*, 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 768 (1990), *aff'd*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), we rejected defendant's claim that the sentencer's discretion is not adequately channeled under Arizona death penalty procedure.

The jury found defendant guilty of conspiracy to murder her son, as well as of the completed crime of premeditated murder pursuant to that conspiracy. These findings are amply supported by the evidence, and provide an adequate basis upon which to find defendant death eligible, although she was not personally the trigger-person. *Cf. Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

## B. Aggravating Factors

The trial court found three statutory aggravating factors: (1) defendant was an adult and the victim was under age 15, A.R.S. § 13–703(F)(9); (2) the murder was committed in expectation of pecuniary gain, A.R.S. § 13–703(F)(5); and (3) the murder was committed in an especially heinous and depraved manner, A.R.S. § 13–703(F)(6). Defendant challenges only the finding that the killing was especially heinous and depraved. However, in conducting our independent review of the death sentence, we necessarily examine all aggravating factors to determine whether they properly apply.

### 1. Especially Heinous and Depraved

■ Milke challenges the trial court's finding that she committed the offense in an especially heinous and depraved manner.[2] In determining whether a crime is especially heinous or depraved,[3] we examine "the mental state and attitude of the perpetrator as reflected in his words and actions." *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). We "have suggested specific factors which lead to a finding of heinousness or depravity." *Id.* These factors are: relishing of the murder by the killer; infliction of gratuitous violence on the victim; needless mutilation of the victim; senselessness of the crime; and helplessness of the victim. *Gretzler*, 135 Ariz. at 52, 659 P.2d at 11. In addition to these five factors, we have also held that killing a person to eliminate a witness to a crime may be considered evidence of depravity. *State v. Gillies*, 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *State v. Smith*, 141 Ariz. 510, 512, 687 P.2d 1265, 1267 (1984).

■ The trial court found that the victim was helpless and the killing was senseless. The trial court also noted that the special parental relationship supported a finding of depravity, and that its "finding of depravity, at least in part, was based upon the age of the victim."

Milke challenges this finding on four grounds. First, she argues that the crime was not senseless because the crime was necessary to accomplish the goals attributed to her by the state, citing *State v. Comer*, 165 Ariz. 413, 429, 799 P.2d 333, 349 (1990), *cert. denied*, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 460 (1991). Milke contends that because the state argued that the murder of her child was her ultimate goal, the killing was not senseless because it was necessary

---

2. The trial court found that cruelty did not exist because "Christopher died quickly ... without terror or horror, without experiencing gratuitously inflicted pain or distress." Thus, cruelty is not before us.

3. Either is sufficient to support an aggravating circumstance under A.R.S. § 13–703(F)(6). *State v. Wallace*, 151 Ariz. 362, 366, 728 P.2d 232, 236 (1986), *cert. denied*, 483 U.S. 1011, 107 S.Ct. 3243, 97 L.Ed.2d 748 (1987).

to accomplish her purported goal. Milke misconstrues *Comer*.

*Comer* held that depravity was established by the senselessness of the murder "in that it was not necessary to carry out appellant's goal of obtaining money and supplies, not that it was committed without purpose." *Id.* Killing her own son so that he would not grow up to be like his father, or killing him so she could be free from parental burdens is, indeed, senseless. Christopher's father wanted to increase his visitation and custody rights, and Milke's parents, Christopher's grandparents, were willing to take care of Christopher on a full-time basis. This crime most certainly was senseless in that it was unnecessary for Debra Milke to *kill* her son to free herself from the responsibility of being a single mother or to prevent the boy from growing up like his father.

Second, defendant disputes the finding of helplessness. Most assuredly, four-year-old Christopher was a helpless victim. He was delivered into the hands of his killers by the person upon whom he should have been able to rely for protection and compassion—his mother. He had no control over what his mother had planned for him. His mother knew that Christopher trusted Styers. *Accord State v. Jimenez,* 165 Ariz. 444, 455, 799 P.2d 785, 796 (1990) (defendant "murdered a helpless [five-year-old] child who trusted him").

Third, defendant argues that the trial court improperly relied upon the parent/child relationship to support its finding of depravity. She contends that to do so unconstitutionally broadens the term "especially cruel, heinous, or depraved," which was given a constitutionally narrow interpretation in *Gretzler.* 135 Ariz. at 50–53, 659 P.2d at 9–12. The Supreme Court has determined that the term "especially heinous, cruel, or depraved" is facially vague. *Richmond v. Lewis,* —— U.S. ——, ——, 113 S.Ct. 528, 534, 121 L.Ed.2d 411 (1992); *Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990). However, the Court has

held that this court's interpretation of that phrase meets constitutional requirements. Most recently in *Richmond v. Lewis,* —— U.S. at ——, 113 S.Ct. at 536, the Court cited *Gretzler* as "*the narrowing construction* of Arizona's (F)(6) factor." (Emphasis added.) In *Lewis v. Jeffers,* 497 U.S. 764, 777–78, 110 S.Ct. 3092, 3100, 111 L.Ed.2d 606 (1990), the Court affirmed our interpretation of the (F)(6) factor in *State v. Jeffers,* 135 Ariz. 404, 429–30, 661 P.2d 1105, 1130–31, *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983), which relied on the five *Gretzler* factors *and* the definition of heinous and depraved set forth in *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).[4] In *Walton v. Arizona,* 497 U.S. at 652–55, 110 S.Ct. at 3057–58, decided the same day as *Jeffers,* the Court, citing *Gretzler,* affirmed *State v. Walton,* in which this court defined depraved as including a case in which the "perpetrator relishes the murder, evidencing debasement or perversion." 159 Ariz. at 587, 769 P.2d at 1033.

We must now determine whether the trial court properly applied this constitutionally narrow interpretation of the (F)(6) factor. The trial court's findings of helplessness and senselessness are clearly based upon *Gretzler* factors. However, the court also relied on the parent/child relationship to support its finding of heinous and depraved. Specifically, the court relied on *Wallace,* 151 Ariz. at 368, 728 P.2d at 238, and *Fulminante,* 161 Ariz. at 256, 778 P.2d at 621, in using the parent/child relationship to support a finding of heinous and depraved. In *Wallace,* the defendant lived as a family with his victims, a mother and her two children. This court found this fact evidenced defendant's "shockingly evil state of mind." 151 Ariz. at 368, 728 P.2d at 238.

In *Fulminante,* the defendant killed and sexually molested his eleven-year-old stepdaughter. The court addressed the parent/child relationship in its finding of depravity:

4. *Knapp* defined the terms heinous and depraved as follows: " 'Heinous' means 'hatefully or shockingly evil; grossly bad'; ... 'depraved' means 'marked by debasement, corruption, per- version or deterioration.' " *Jeffers,* 135 Ariz. at 429, 661 P.2d at 1130 (citing *Knapp,* 114 Ariz. at 543, 562 P.2d at 716).

We believe the record supports the findings of heinous or depraved conduct in the case before us. Defendant senselessly killed a helpless victim, and as reprehensible as this may be, also violated the special parental relationship.

As the trial court noted ... [the victim] was a child under parental control and capable of manipulation by the Defendant. *Fulminante*, 161 Ariz. at 256, 778 P.2d at 621.

In *State v. Stanley*, 167 Ariz. 519, 809 P.2d 944, *cert. denied*, —— U.S. ——, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991), the defendant killed his wife and five-year-old daughter. The court found the "killing of a helpless child [was] senseless and demonstrate[d] a disregard for human life satisfying two of the five *Gretzler* factors." *Id.* at 528, 809 P.2d at 953. In addition, the court focused on the parent/child relationship in finding the killing especially heinous and depraved. It stated:

When a father kills his own child, his actions cannot be characterized as sensible, nor can his state of mind be considered other than perverted. This fact sets this crime apart from the norm of first-degree murders and warrants a finding that the murder was committed in an especially depraved manner.

*Id.* at 529, 809 P.2d at 954. The court found the facts of *Stanley* "[e]ven more egregious than the facts in *Wallace* ... *because the child was Stanley's own daughter.*" *Id.* (Emphasis added.)

 Defendant attempts to distinguish *Stanley*, where the child victim was killed to eliminate her as a potential witness, which arguably constituted additional aggravation not present in this case. Clearly, however, *Stanley* permits use of the parent/child relationship. *See also Fulminante*, 161 Ariz. at 256, 778 P.2d at 662 (where no element of witness elimination was present).

Although the parent/child relationship does not fit neatly within any of the five *Gretzler* factors, *Gretzler* also relied on the·*Knapp* language to define "heinous" and "depraved." We have never said that the *Gretzler* factors are exclusive. We hold that the use of the parent/child relationship by the trial court in this case, like the use of similar relationships in *Stanley*, *Fulminante*, and *Wallace*, is permissible and is within the *Gretzler–Knapp* parameters.

Finally, defendant argues that even if this court agrees that the victim was helpless and the killing senseless, additional aggravation is necessary to support the especially heinous and depraved factor. Although the language of several cases would seem to belie defendant's argument, *see Gretzler*, 135 Ariz. at 52–53, 659 P.2d at 11–12 ("senselessness or helplessness need not always lead to a holding that crime is heinous or depraved"), it is unnecessary to resolve it because the additional factor of the parent/child relationship is present here.

A mother's conspiracy to murder her own four-year-old child and the resultant premeditated murder of that child is the ultimate perversion of the parent/child relationship. The crime in this case can be described without reservation as "hatefully or shockingly evil" and "marked by debasement, corruption, perversion or deterioration." *Gretzler*, 135 Ariz. at 51, 659 P.2d at 10 (citing *Knapp*, 114 Ariz. at 543, 562 P.2d at 716). The parent/child relationship is a circumstance that separates this crime from the "norm" of first degree murders. The use of that relationship in partial support of a finding of heinousness and depravity under § 13–703(F)(6) is constitutionally permissible.

## 2. Pecuniary Gain

The trial court found that the murder was committed in the expectation of pecuniary gain. In making this finding, the trial court stated:

The evidence is that the defendant purchased and had a life·insurance policy insuring the life of Christopher Milke. However, the mere existence of the policy does not prove, beyond a reasonable doubt, that the murder was committed for the money—that the money was the reason the child was killed. The State argues the insurance money was the impetus for the murder. In the opening statement, closing argument and during the course of the trial the State has advanced other theories and motives for the murder.... The

State has produced evidence of the Defendant's wish that the child were dead before the life insurance came into existence.

The only evidence presented linking the death to the procurement of life insurance proceeds has come from the defendant's testimony. In her statement to Det. Saldate, Ms. Milke denied having a life insurance policy insuring her son. At trial Ms. Milke testified she did not know she was purchasing life insurance on her son as part of her employment benefits package—that she thought the life insurance was an automatic part of the benefits package. She later testified she has always maintained life insurance on Christopher, ever since he was born, using the rationale "since I was fully insured I thought he should be." Were it not for these inconsistent statements and initial denial as to the existence of the policy, I would not be able to find that the defendant committed the offense in expectation of the receipt of anything of pecuniary value. But taking all of the evidence as a whole, it is clear, and the state has proven, beyond a reasonable doubt, that a motivating factor for the murder, although not the only reason for the murder, was the proceeds from the life insurance policy.

From Milke's inconsistent statements, the trial court infers that one of her motives for killing her son was to collect the $5000 life insurance proceeds, and that the statements were an attempt to conceal this motive. In our independent reweighing of the evidence, however, we conclude that it is equally plausible that the inconsistent statements were Milke's attempt to divert suspicion from her. Believing that the police suspected insurance money to be a motive, she may have felt that she could deflect suspicion by denying knowledge of the insurance. One inference is as believable as the other.

 To establish pecuniary gain, the state must prove beyond a reasonable doubt that "the hope of financial gain supplied the impetus for the murder." *State v. Robinson*, 165 Ariz. 51, 60, 796 P.2d 853, 862 (1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1025, 112 L.Ed.2d 1107 (1991). Because conflicting inferences can be drawn from the evidence

on pecuniary gain, we conclude that the state did not establish this factor beyond a reasonable doubt.

### 3. Victim Under Age Fifteen

Milke does not challenge this factor, nor is it subject to challenge. Milke was 25 years old at the time of the offense, and her son, Christopher, was only four years old. Although evidence of Christopher's age was also used, in part, to establish that the crime was especially heinous and depraved, the trial court properly weighed the victim's age only once. *See Jimenez*, 165 Ariz. at 454, 455–56, 799 P.2d at 795, 796–97.

### C. Mitigating Circumstances

Defendant offered the following non-statutory mitigating factors: defendant's grief, alleged legitimate question concerning guilt, lack of a prior felony record, potential for rehabilitation, defendant's deprived childhood, defendant's employment history, defendant's conduct while incarcerated and during trial, her risk of future criminal conduct, and gender. The trial court found that no statutory mitigating circumstances were present and that only three of the non-statutory circumstances were entitled to any weight: no prior felony record, employment history, and conduct while incarcerated. In determining the appropriate sentence, the trial court concluded that "[c]onsidering the nature of the person and the nature of the crimes, the nature and extent of the aggravating circumstances and the nature and extent of the mitigating circumstances, I find that the mitigating circumstances are not sufficient to call for leniency."

 Defendant complains that the trial court erroneously failed to consider her grief as non-statutory mitigation. The defendant bears the burden of proving mitigating circumstances by a preponderance of the evidence. *State v. McMurtrey*, 143 Ariz. 71, 691 P.2d 1099 (1984).

Defendant relied on testimony from her prison counselor, two prison psychiatrists, and three neighbors to establish her grief. The state rebutted with testimony from two psychiatrists who had not personally exam-

ined defendant. Additionally, there was trial testimony of several witnesses who saw defendant on December 2 and 3, 1989.

The mental health experts disagreed on whether defendant's grief was a reaction to her loss of freedom or the loss of her son. The witnesses who observed defendant's conduct on December 2 and 3, 1989, also gave conflicting accounts. Although she apparently was upset and nervous, she did not behave like a mother concerned for her son's welfare. She appeared to be overly concerned with Styers' welfare and with what would happen to her.

The trial court's special verdict stated:

Testimony has been presented that the Defendant has experienced grief. However, no one has been able to state whether the grieving is for the loss of a son or is for the loss of freedom. On December 3, 1989[,] the defendant demonstrated little grief concerning the death of her son.

 Whatever the proper role of grief may be as a result of one's own acts, our independent review of the conflicting evidence leads us to agree with the trial court that defendant's grief in this case has not been shown to be a mitigating factor. *See State v. Smith,* 123 Ariz. 231, 242–43, 599 P.2d 187, 198–99 (1979) (affirming trial court's refusal to find mitigating factor when the evidence was contradictory). When mitigation evidence is conflicting and involves considerations of credibility, we give great deference to the trial court's conclusions. *State v. Fierro,* 166 Ariz. 539, 553, 804 P.2d 72, 86 (1990).

### D. Independent Review

 In death penalty cases, this court independently reviews aggravating and mitigating circumstances to determine whether the death penalty was properly imposed. *See State v. Rossi,* 171 Ariz. 276, 278, 830 P.2d 797, 799, *cert. denied,* — U.S. —, 113 S.Ct. 610, 121 L.Ed.2d 544 (1992). In this case, we have concluded that the trial court correctly found two statutory aggravating circumstances; namely, the age of the victim and the especially heinous or depraved nature of the murder. Defendant is therefore to receive the death penalty unless there are mitigating circumstances sufficiently substantial to call for leniency. A.R.S. § 13–703(E).

The trial court found no statutory mitigating circumstances. Based upon our independent review of the entire record, we agree with that conclusion. The trial court considered all of the items offered as non-statutory mitigating circumstances and concluded that only three of them amounted to mitigation. Those three were: no prior record, employment history, and conduct while incarcerated. Based upon our independent review of the record, we agree with the trial court's finding that the other items offered as non-statutory mitigation were not shown by a preponderance of the evidence to be mitigating. With respect to the remaining three items, the trial court found them to be insufficient to warrant reduction of the death penalty and we agree. In short, we agree with all of the trial court's findings and weighings save one: in our independent review, we conclude that the state did not prove beyond a reasonable doubt that this defendant committed the crime for pecuniary gain.

Recently, this court engaged in an extensive discussion of the proper procedure to be employed when this court sets aside one, but not all, of the statutory aggravating circumstances. The advantages and disadvantages of reweighing versus remand are fully set forth in that recent discussion. *See State v. Bible,* 175 Ariz. 549, 858 P.2d 1152 (1993). We believe the instant case falls within the narrow class of cases where it is appropriate for this court to itself reweigh rather than to remand. There is no new evidence to be received and no evidence was improperly excluded at the sentencing hearing. The mitigation evidence is, at best, *de minimis.* Although one statutory aggravating circumstance was set aside, there is certainly nothing in the evidence concerning that topic that constitutes mitigation.

 Given the facts of this case, the presence of two separate statutory aggravating circumstances and the *de minimis* nature of the mitigation, it is inconceivable that the removal of the pecuniary gain factor would lead to any different result in the trial court.

Our review satisfies us that the mitigation is wholly insufficient to reduce to life even given the absence of the pecuniary gain factor. As we stated in *Bible*, there is "simply nothing to weigh or balance." *Id.* at 609, 858 P.2d at 1212. Thus, as in *Bible*, "we are able to affirm the imposition of the death sentence even though we have found that one of the three aggravating circumstances was inapplicable." *Id.* at 609, 858 P.2d at 1212.

### State's Cross–Appeal

### 5. Admissibility of Co–Defendant Scott's Confession at Sentencing

At the presentence hearing, the state offered co-defendant Scott's confession in an attempt to establish that Milke procured the commission of the offense by promising payment from the insurance proceeds. *See* § 13–703(F)(4). The trial court found that admission of Scott's confession would violate Milke's Sixth Amendment confrontation rights. The state argues that the confrontation clause does not apply to sentencing proceedings, and that Scott's confession is admissible under the Arizona Rules of Evidence, particularly Rule 804(b)(3).

Because we are affirming the murder conviction and death sentence, this issue in the state's cross-appeal is moot. *See Progressive Specialty Ins. Co. v. Farmers Ins. Co.,* 143 Ariz. 547, 548, 694 P.2d 835, 836 (App.1985) (noting that appellate courts should not decide questions that have no practical effect on litigants' rights or that are unnecessary to disposition of appeal).

Nevertheless, the state urges us to address this issue notwithstanding its mootness because (1) it is a recurring problem in homicide cases, particularly capital cases; (2) the Arizona Court of Appeals has allegedly misconstrued the applicability of the confrontation clause to hearsay exceptions in some cases; and (3) resolution now will streamline future litigation in this case should a federal court reverse the sentence and remand for resentencing.

Although sympathetic to the state's desire to have the issue resolved, we must also recognize that, in resolving an important and difficult issue of law, the prudent approach is to decide it in a case in which it is *necessary* to decide it and in which all of the permanent members of this court are participating, if possible. *See Hazine v. Montgomery Elevator Co.,* 176 Ariz. 340, 349, 861 P.2d 625, 629 (1993). Therefore, we decline the invitation to consider this moot issue.

### 6. Concurrent Sentence for Child Abuse

The state's cross-appeal contends that defendant's sentence for child abuse is illegal because the court failed to order, pursuant to § 13–604.01(J), that the sentence be consecutive to the murder, conspiracy, and kidnapping sentences. As noted above, the child abuse conviction is being reversed for reasons stated in the companion case of *Styers,* 177 Ariz. at 108, 865 P.2d at 769. Therefore, the issue of sentencing on the child abuse conviction is moot.

### 7. Conspiracy Sentence

On count 2, conspiracy, defendant was sentenced under the conspiracy statute, A.R.S. § 13–1003(D), which provides:

Conspiracy to commit a class 1 felony is punishable by a sentence of life imprisonment without possibility of release on any basis until the service of twenty-five years, otherwise, conspiracy is an offense of the same class as the most serious offense which is the object of or the result of the conspiracy.

Because defendant was convicted of conspiracy to commit a class 1 felony (first degree murder), she was sentenced to life imprisonment without possibility of release for 25 years.

The state contends that defendant should have been sentenced pursuant to the murder statute, A.R.S. § 13–703(A), which provides:

A person found guilty of first degree murder as defined in § 13–1105 shall suffer death or imprisonment ... for life, without possibility of release on any basis until the completion of ... twenty-five calendar years if the victim was fifteen or more years of age and thirty-five years if the victim was under fifteen years of age....

The state argues that defendant should have received, on the conspiracy count, life with-

out possibility of release for 35, rather than 25, years because Christopher, the victim, was under age 15. This is the sentence defendant would have received for the murder of Christopher had she been spared the death sentence.

■ The state contends that A.R.S. § 13–1003(D) is ambiguous and its language is contrary to the legislature's intent to punish more severely those criminals whose victims are under age 15. Although the legislature has specified harsher sentences for criminals whose victims are under age 15 in several instances, *see, e.g.,* A.R.S. §§ 13–604.01 (dangerous crimes against children), 13–703(A) (increased sentence when first degree murder victim is under age 15), 13–1204(B) (increased sentence when aggravated assault victim is under age 15), and 13–1304(B) (increased sentence when kidnapping victim is under age 15), "[w]e cannot assume that the legislature's failure to do so [in this statute] was a matter of inadvertence." *Matter of Pima County Juvenile Appeal No. 74802–2,* 164 Ariz. 25, 33, 790 P.2d 723, 731 (1990). The legislature is the proper forum to which the state should make its policy argument that potential child victims of first degree murder conspiracies deserve more protection. *See id.* at 34, 790 P.2d at 732.

The state next argues that the legislature intended to punish persons convicted of conspiracy pursuant to a "specified scheme" by which conspiracy would be subject to the same sentence as the offense that is the object of the conspiracy. This theory advanced by the state could result in a death sentence when the object of the conspiracy is first degree murder, even if the murder was never carried out. The language of A.R.S. § 13–1003(D), insofar as it relates to conspiracies to commit class 1 felonies, may have been intended to prevent just such an anomalous result. *See City of Phoenix v. Superior Court,* 144 Ariz. 172, 177, 696 P.2d 724, 729 (App. 1985) ("courts will avoid statutory interpretations that lead to absurd results which could not have been contemplated by the legislature").

To us, § 13–1003(D) seems clear and unambiguous. Defendant was convicted of conspiracy to commit first degree murder.

First degree murder is a class 1 felony. A.R.S. § 13–1105(C). Section 13–1003(D) provides: "*Conspiracy to commit a class 1 felony is punishable by a sentence of life without possibility of release [for] 25 years.*" (Emphasis added.) The language of § 13–1003(D) is precise, unambiguous, and leaves no room for interpretation. *See id.; see also State v. Reynolds,* 170 Ariz. 233, 234, 823 P.2d 681, 682 (1992) ("If a statute's language is clear and unambiguous, the court will give it effect without resorting to other rules of statutory construction."); *State v. Arnett,* 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978) ("in construing a statute, if the language is plain, there is no occasion for construction or interpretation."). The sentence imposed by the trial court on the conspiracy count was proper.

## DISPOSITION

We have searched the record for fundamental error. Pursuant to that search, we vacate the conviction for child abuse. We affirm the convictions for murder, conspiracy, and kidnapping. Although we vacate the trial court's finding of pecuniary gain as a statutory aggravating factor, we nevertheless affirm the death penalty on the murder count. We affirm the other sentences.

CORCORAN, ZLAKET and MARTONE, JJ., and McGREGOR, Judge, Court of Appeals, concur.

FELDMAN, C.J., did not participate in the determination of this matter. Pursuant to Ariz. Const. art. VI, § 3, RUTH V. McGREGOR, J., Court of Appeals, Division One, was designated to sit in his stead.